KAY MANUFACTURING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 26365, 33608.   Promulgated January 13, 1930.

*Benjamin Mahler, Esq.*, for the petitioner.
*E. W. Shinn, Esq.*, for the respondent.

758

OPINION.

MARQUETTE: The first assignment of error in Docket No. 26365 and the first five assignments of error in Docket No. 33608 may be considered and disposed of together. The following tabulation shows, for each of the years on appeal, the total of debts charged against the reserve for bad debts, the addition to the reserve for bad debts, the deduction for bad debts taken in return, and the deduction for bad debts allowed by the respondent:

|  | 1922 | 1923 | 1924 | 1925 |
|---|---|---|---|---|
| Debts charged against reserve | $7,490.11 | $11,286.90 | $12,073.47 | $1,334.66 |
| Addition to reserve for bad debts | 11,356.97 | 30,555.93 | 14,750.85 | 18,000.00 |
| Deduction for bad debts in return | 11,356.97 | 30,555.93 | 14,750.85 | 12,486.38 |
| Deduction for bad debts by respondent | 8,272.15 | 13,232.69 | 12,073.47 | 908.12 |

The addition to the reserve for bad debts for 1922 of $11,356.97 was not recorded on the books until June 14, 1923, but was claimed as a deduction in the return for 1922 in lieu of a deduction based upon specific bad debt items. In the returns for 1923 and 1924 petitioner deducted the additions to the reserve for bad debts made in those years. For 1925 the petitioner took a deduction for bad debts which is less than the addition for that year to the reserve for bad debts, but greater than the total of debts charged against the reserve in that year. The respondent refused to allow as bad debt deductions the additions to the reserve for bad debts made in, or for, each of the years concerned in these appeals, but allowed deductions presumably representing debts ascertained to be worthless during the year. The deductions allowed by respondent for 1922 and 1923 are greater than the total charges of that year against the reserve. For 1925 the deduction allowed by the respondent is slightly less than the total charges of the year against the reserve.

No question has been raised as to the reasonableness of the additions to the reserve for bad debts made by the petitioner during the years on appeal. In each instance the respondent's determination as to the deduction for bad debts was based upon the following grounds: (1) That the petitioner elected to take a deduction for bad debts for 1921 based upon specific bad debt items; (2) that such election was binding upon the petitioner for all future years, unless it received permission from respondent to make a change; and (3) the petitioner did not seek or obtain the permission of respondent to change the election exercised in 1921. The petitioner contends that it elected,

for 1921, to take a deduction for a reasonable addition to the reserve for bad debts; that the deduction in the return for 1921 based upon specific bad debts, instead of a deduction based upon a reasonable addition to the reserve, was the act of an employee in willful disregard of the petitioner's wishes and contrary to its election; that even assuming that it did not elect to make the deduction for bad debts upon the basis of a reasonable addition to the reserve until 1922, that fact does not preclude it from making a deduction for 1922 based upon a reasonable addition to the reserve; that during the years on appeal it maintained, as a part of the method of accounting regularly employed in keeping its books, a reserve for bad debts, and, so long as the method of accounting employed in keeping the books clearly reflects income, the statute makes it mandatory that in computing net income bad debts shall be treated in accordance with the method employed in keeping the books; and that, so far as the years 1924 and 1925 are concerned, it may exercise a new option under the provisions of the 1924 Act, since the latter repealed the 1921 Act.

The questions presented by this issue are governed by the provisions of section 234 (a) (5) of the Revenue Acts of 1921 and 1924, which reads as follows:

Debts ascertained to be worthless and charged off within the taxable year (or in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts) ; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt to be charged off in part; * * *.

Regulations 62, promulgated by the respondent under the provisions of the Revenue Act of 1921, so far as material here, provide as follows:

ART. 151. *Bad Debts.*—Bad debts may be treated in either of two ways— (1) by a deduction from income in respect of debts ascertained to be worthless in whole or in part, or (2) by a deduction from income of an addition to a reserve for bad debts. For the year 1921 taxpayers may, regardless of their previous practice, elect either of these two methods and will be required to continue the use in later years of the method so elected unless permission to change to the other method is granted by the Commissioner.

Regulations 65, promulgated by the respondent under the provisions of the Revenue Act of 1924, so far as material here, provide as follows:

ART. 151. *Bad Debts.*—Bad debts may be treated in either of two ways— (1) by a deduction from income in respect of debts ascertained to be worthless in whole or in part, or (2) by a deduction from income of an addition to a reserve for bad debts. Taxpayers were given an option for 1921 to select either of the methods mentioned for treating such debts. See article 151, Regulations 62. The method used in the return for 1921 must be used in returns for subsequent years and for returns under the Revenue Act of 1924 unless permission is granted by the Commissioner to change to the other method.

In the return for 1921 petitioner made a deduction from income in respect of bad debts ascertained to be worthless. In the return for 1922 it made a deduction from income of an addition to the reserve for bad debts, although the addition to the reserve was not made on the books of account until June 14, 1923. Thus, the option to deduct " a reasonable addition to a reserve for bad debts," in lieu of specific bad debts, was first exercised, so far as the returns are concerned, for 1922. The deductions taken in the returns for 1922 and later years were contrary to respondent's regulations, for they differed in both form and substance from the deduction taken in the return for 1921, which was presumed to reflect the petitioner's election of a method of treating bad debts, and the change reflected by the deductions taken in the returns for 1922 and later years was made without seeking or obtaining the respondent's permission.

The option to deduct " a reasonable addition to a reserve for bad debts " in lieu of " debts ascertained to be worthless and charged off within the taxable year," first appeared in the Revenue Act of 1921. In the regulations promulgated under that Act, the respondent granted permission to all taxpayers, regardless of their previous practice, to elect, for 1921, either of the two methods prescribed by statute for treating bad debts, with the understanding that the election made for 1921 would be binding upon them for all subsequent years unless permission to change was granted by him. The requirement that a taxpayer first obtain the permission of the respondent before making a change in the method of treating bad debts was necessary in the interests of an orderly procedure in examination of returns. The respondent had a right to be given due notice of any change in the method of treating bad debts, in order that proper adjustments could be made to prevent any distortion of income of the year of change. Further, since the statute made the optional deduction of a reasonable addition to the reserve a matter of discretion with the respondent, it was entirely proper that he should require due notice, in the form of a request for permission to change, in order that he might give consideration to the taxpayer's reasons for desiring to make the change and thereby exercise the discretionary power vested in him by the statute. Furthermore, the statute certainly does not contemplate the promiscuous changing of the method of treating bad debts, and it was doubtless to obviate any such practice, and for other reasons already stated, that Congress vested this discretionary power in the respondent. It is our opinion that the requirement of the regulations that a taxpayer who exercised an election for 1921 as to the method of treating bad debts shall be bound by such election for all subsequent years, unless it asks the permission of the respondent to change to the other method and has

a reasonable right to obtain it, is a valid exercise of discretion by the respondent.

It is contended, in the petitioner's behalf, that it elected for 1921 to deduct a reasonable addition to the reserve for bad debts; that the deduction of debts ascertained to be worthless and charged off within the year in the return for 1921 was the act of an employee in willful disregard of the petitioner's wishes; and that the return for 1921 did not reflect its election. We can not acquiesce in these contentions. Mahler, who prepared the return for 1921, testified that Lipper, petitioner's vice president, in charge of financial matters, advised him that the deduction for 1921 for bad debts was to be made on the reserve basis. In this respect the testimony of Mahler is corroborated by that of Lipper. Mahler testified further that he consulted with Lipper as to what would be a reasonable reserve for 1921; that Lipper's estimate as to a reasonable reserve was approximately the same amount which had been deducted for specific bad debts in the return which he (Mahler) had already prepared for 1921; and that he (Mahler) filed the return for 1921 as he had prepared it without advising Lipper that the deduction made in the return for bad debts was based upon specific bad debts rather than a reasonable addition to a reserve for bad debts. We have not been told as a matter of dollars and cents what Lipper's estimate as to a proper reserve for 1921 amounted to. We were given to understand by Lipper that he regarded 7 per cent of the accounts receivable outstanding at the close of 1921 as a proper reserve. In fact, an entry was made in the journal, under date of June 14, 1923, purporting to set up a reserve for bad debts for 1921 in the amount of $8,493.66, which was the equivalent of 7 per cent of the accounts receivable outstanding at the close of that year, although this journal entry was never posted to the general ledger. The deduction taken in the return for 1921 prepared by Mahler for specific bad debts amounted to only $4,149.20, or less than one-half of Lipper's estimate of a proper reserve for bad debts for that year; and this does not coincide with Mahler's testimony that he refrained from making any change in the return which he had prepared for 1921, in respect of the deduction for bad debts, because Lipper's estimate as to a proper reserve for bad debts for that year was approximately the same as the deduction taken in the return for specific bad debts.

Three considerations lead us to conclude that the petitioner did not elect for 1921 to take a deduction for a reasonable addition to a reserve for bad debts. First, it is reasonable to presume that had any serious consideration been given to the matter, the petitioner would have chosen the course most advantageous to it and deducted a reasonable addition to the reserve, since such a deduction would

have been more than twice as great as the deduction taken for specific bad debts; secondly, no reserve for bad debts for 1921 has ever been recorded on the ledger—the first reserve recorded on the ledger was entered on June 14, 1923, as of January 1, 1923; thirdly, Lipper, as petitioner's vice president, executed the jurat on the 1921 return, and having done so, he is presumed to have known what that return contained.

Upon the record before us, we find that petitioner first elected to treat its bad debts on a reserve basis in 1922; that such election was contrary to respondent's regulations and, therefore, void; that petitioner having elected for 1921 to take a deduction for specific bad debts, and having failed to obtain the permission of the respondent to change to a reserve basis, the election which it made for 1921 is binding upon it for all of the years on appeal.

It is also contended by the petitioner that it is entitled to deductions for bad debts for 1923, 1924, and 1925, in amounts equal to the additions made to the reserve for bad debts in those years. The petitioner offered no evidence to show that it is entitled to any greater deductions for bad debts than those allowed by the respondent. For 1922 and 1923 the deductions allowed by the respondent are greater than the total debts charged against the reserve in those years. The deduction allowed by the respondent for 1924 is equal to the total debts charged against the reserve in that year. The deduction allowed by the respondent for 1925 is slightly less than the total debts charged against the reserve in that year. We find no error in the respondent's determination as to proper deductions for bad debts for the years on appeal.

The petitioner contends that the failure of the respondent to mail the deficiency notice for 1922 to the petitioner's then address, 10 Warren Street, Brooklyn, N. Y., renders the notice void, and that assessment of the additional tax for that year is now barred by the statute of limitations. We are unable to perceive any merit in this contention. The notice was addressed to the petitioner and was actually received by the petitioner, and the appeal was taken to this Board more than 10 days before the expiration of the 60-day period allowed therefor. The notice having been actually received, and an appeal therefrom having been taken, we consider that, if the mailing to the wrong address rendered the notice defective in any way, the defects have been waived by the petition. Certainly the petitioner has been deprived of none of its rights. This disposes of the second assignment of error in Docket No. 26365.

We have found upon the evidence that the cost to petitioner of machinery and fixtures on hand at January 1, 1922, was $43,204.30; that the cost to petitioner of automobiles on hand at January 1, 1922,

was $11,896.08; that the average life of machinery and fixtures on hand at January 1, 1922, was 10 years from the date of acquisition; and that the average life of automobiles on hand at January 1, 1922, was five years from the date of acquisition. There is no evidence in the record of purchases of additional machinery and fixtures and automobiles during 1922. Upon the basis of the facts above enumerated, we find that the petitioner is entitled to an allowance for depreciation, in respect of machinery and fixtures and automobiles, for 1922, of $6,699.64. Since the Commissioner made an allowance of only $5,985.39, the net income for 1922 has been overstated in the deficiency notice of $714.25. This disposes of the third assignment of error in Docket No. 26365.

The petitioner complains of respondent's action in disallowing a deduction for 1925 of $6,871.40, representing the estimated cash discounts which would be taken by, or allowed to, customers upon payment of the accounts receivable outstanding at December 31, 1925. Petitioner allowed to certain of its customers in respect of sales made in 1925, upon payment of accounts, a discount of 3 per cent of sales price. At the close of 1925 petitioner accrued a liability for cash discounts on its books in the amount of $6,871.50, and deducted said item in its income-tax return. The deduction was disallowed by the respondent. The evidence does not show any error in respondent's action. While the record shows the amount of accounts receivable outstanding at December 31, 1925, there is nothing to show which of these accounts, if any, accrued prior to 1925. There is no evidence of the amount of cash discounts actually allowed to customers in respect of sales made in 1925. This disposes of the sixth assignment of error in Docket No. 33608.

During the period of its occupancy of the premises at 3 to 5 Washington Street, Brooklyn, N. Y., petitioner made installations of electric wiring, for use in light factory work, at a total cost of $2,170.41. When the petitioner surrendered the Washington Street premises in 1923, it abandoned these installations of electric wiring and it did not receive any payment therefor from the owner of the premises. This electric wiring is part of the machinery and fixtures on hand at January 1, 1922, as to which we have found an average life of 10 years from date of acquisition. The depreciated cost of the installations of electric wiring, at the date of abandonment, was $1,347.49, and the petitioner is entitled to a loss deduction for 1923 of that amount.

During 1923 the petitioner installed an exhaust, electric wiring, electric motors, and a Gehnrick japanning oven at 500 Driggs Avenue, Brooklyn, N. Y., at a total cost of $5,751.35. In 1925 petitioner obtained a 20-year lease of the premises at 10 Warren Street,

Brooklyn, N. Y., and in February, 1926, it surrendered the Driggs Avenue and Morton Street premises and moved its plant and offices to the Warren Street premises. Upon removal from the Driggs Avenue premises, the exhaust, electric wiring, and Gehnrick japanning oven installed in 1923 were abandoned while the electric motors installed in the same year were sold. There is no evidence in the record as to the probable life of these assets, from the date of acquisition, nor as to the amount of depreciation sustained thereon to the date of abandonment. Nor is there any evidence satisfactorily establishing the salvage value of this equipment, nor as to the amount realized from the sale of the electric motors. Under the circumstances, we are unable to determine the amount of the loss which the petitioner suffered, if any, upon the abandonment of this equipment.

On October 13, 1923, petitioner installed electric wiring in either the premises at 500 Driggs Avenue or in the premises at 20 Morton Street, Brooklyn, N. Y., at a total cost of $235. Both of these premises were surrendered in 1926, and the wiring installed was abandoned. There is no evidence as to the probable life of this asset, nor as to the amount of depreciation sustained thereon to the date of abandonment. Under the circumstances, we are unable to determine the amount of the loss which the petitioner suffered, if any, upon the abandonment of this asset.

The three preceding paragraphs dispose of the seventh assignment of error in Docket No. 33608.

The petitioner contends that it is entitled to a deduction from income for each of the years 1923 to 1925, inclusive, of the amount payable or allowable to customers on account of freight, approximating 3 per cent of the accounts receivable outstanding at the end of the year. In 1923 or 1924 petitioner adopted the rule, in respect of sales involving shipment by freight, of paying the freight charges or making an allowance to customers for freight charges paid by them. On an average, the annual freight charges and allowances represented 3 per cent of total invoice prices. There is no evidence, however, as to how this 3 per cent of total invoice prices should be apportioned to freight charges paid by the petitioner, and presumably deducted in its returns, and to freight allowances to customers. Under the circumstances, we are unable to determine the amount of the liability to customers at the close of each year on account of allowances for freight to be paid by them.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

SMITH concurs in the result only.