WILLIAM H. WILLARD and JUDITH T. WILLARD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; GEORGE M. WILLARD and SUSAN J. WILLARD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Willard v. Commissioner
Docket Nos. 2164-80, 2165-80
United States Tax Court
T.C. Memo 1983-656; 1983 Tax Ct. Memo LEXIS 136; 47 T.C.M. (CCH) 200; T.C.M. (RIA) 83656; October 27, 1983. Vincent L. Alsfeld, C.P.A., for the petitioners. Charles W. Maurer, Jr., for the respondent. RAUM
*137 MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined the following income tax deficiencies and additions to tax in these consolidated cases: Docket
Additions to Tax, I.R.C. 1954
Name
No.
Year
Deficiency
Sec.6651 (a)
Sec.6653 (a)
William H. Willard
2164-80
1976
$6,889.79
$1,445.37
and Judith T.
1977
10,208.66
$510.43
Willard
George M. Willard
2165-80
1976
7,189.15
1,446.66
and Susan J.
1977
9,974.78
498.74
Willard
The parties have resolved all of the issues with respect to the 1977 deficiency, and most of the issues with respect to the 1976 deficiency. The only issues remaining for decision are (1) whether the Commissioner abused his discretion in disallowing the 1976 addition to the bad debt reserve of Knight Foundation, Inc., an electing small business ("subchapter S") corporation all of the stock of which was owned equally by petitioners William H. Willard ("William") and George M. Willard ("George"), and (2) whether petitioners are liable for additions to tax pursuant to section 6651(a), I.R.C. 1954, for 1976 and section 6653(a), I.R.C. 1954, for 1977. *138 FINDINGS OF FACT Some of the facts have been stipulated.The stipulation of facts and attached exhibits are incorporated herein by reference. The petitioners in each of these cases are husband and wife. Each couple filed joint income tax returns for the years involved, and all of them resided in New Hampshire when the petitions herein were filed. William and his wife filed their 1976 return on January 31, 1978, and George and his wife filed their 1976 return on January 30, 1978. William and George are brothers. During the taxable years 1976 and 1977 they were the sole and equal shareholders of Knight Foundations, Inc. ("Knight"), a New Hampshire corporation engaged in the concrete construction business, with principal offices in Temple, New Hampshire. It was incorporated in 1970. During the years in issue, it was an electing small business corporation pursuant to sections 1371 and 1372, I.R.C. 1954. The following table, based upon Knight's returns, shows its gross annual sales (less returns and allowances) and its outstanding year-end receivables for the years indicated: Gross Annual
Year-end
Year
Sales
Receivables
1970
$17,227.58
$9,835.20
1971
112,703.23
11,734.20
1972
162,489.93
20,367.85
1973
121,154.00
43,072.00
1974
175,194.00
36,656.00
1975
177,409.00
72,860.00
1976
285,258.00
48,407.00
1977
312,608.00
48,598.00
1978
346,619.00
87,297.00
1979
434,497.00
48,953.00
*139 Beginning with 1970, the year of its incorporation, Knight utilized the "reserve" method to account for its bad debts in accordance with section 166(c), I.R.C. 1954. The deductions (or additions to its bad debt reserve) which it thus claimed for the years 1970 through 1975 were as follows: 1970
$516.83
1971
615.83
1972
7,277.26
1973
785.00
1974
9,528.00
1975
9,411.00
$28,133.92 [1]
On its 1976 return Knight claimed a bad debt deduction of $12,797 based on its addition to its bad debt reserve for that year. [2] None of Knight's returns for the years 1970 through 1979 shows any charge against the reserve for bad debts actually incurred. The Commissioner determined that Knight's 1976 addition to its bad debt reserve was unreasonable and disallowed in toto the $12,797 deduction based on that addition. As a consequence of Knight's subchapter S election, *140 the increase in income which resulted from this disallowance flowed through to petitioners, and was reflected in the deficiency notices herein. The Commissioner also determined additions to tax against each petitioner-couple pursuant to section 6651(a) for 1976 and section 6653(a) for 1977. OPINION 1. Deduction for addition to bad debt reserve. At issue is the propriety of the Commissioner's disallowance of a $12,797 deduction for Knight's 1976 addition to its bad debt reserve. Ordinarily, the tax laws do not allow deductions in respect of reserves, Massachusetts Business Development Corp. v. Commissioner,52 T.C. 946, 950 (1969), deductions may be taken only when losses actually occur, Brown v. Helvering,291 U.S. 193 (1934). However, Congress, in the Revenue Act of 1921, relaxed this general rule with regard to bad debt deductions by allowing a taxpayer to deduct bad debts prospectively through the use of a bad debt reserve. This exception to the general rule is now embodied in section 166(c) of the 1954 Code which provides: (c) Reserve for Bad Debts. In lieu of any deduction under subsection (a), [3] there shall be allowed (in the discretion *141 of the Secretary) a deduction for a reasonable addition to a reserve for bad debts. Thus, in lieu of deductions allowed under section 166(a) for specific debts which is fact become worthless or partially worthless during the taxable year, the reserve method permits a taxpayer to deduct currently an estimate of future losses in respect of year-end outstanding receivables. This method requires the establishment of a reserve against which there is charged any debt which becomes worthless during the year and which is augmented annually by a reasonable addition thereto. The reasonableness of the addition "will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve". Section 1.166-4(b), Income Tax Regs.
In view of the obvious potential for abuse, Congress did not give taxpayers an unlimited right to make additions to their bad debt reserves; rather, it explicitly conditioned the *142 allowable deduction in section 166(c) upon "the discretion of the Secretary [or his delegate, the Commissioner]". Moreover, where the Commissioner has disallowed a deduction for an addition to a bad debt reserve, the taxpayer has a particularly heavy burden to show that the Commissioner's determination was erroneous. He must show not only that his own addition to the reserve was "reasonable", but also that the Commissioner's disallowance was "unreasonable and arbitrary". See Thor Power Tool Co. v. Commissioner,439 U.S. 522, 548 (1979); Malone & Hyde, Inc. v. United States,568 F. 2d 474, 477 (6th Cir. 1978); First Nat. Bank of Chicago v. Commissioner,546 F. 2d 759, 761 (7th Cir. 1976), cert. denied, 431 U.S. 915 (1977); Patterson v. Pizitz,Inc.,353 F. 2d 267, 270 (5th Cir. 1965), cert. denied 383 U.S. 910 (1966); Massachusetts Business Development Corp. v. Commissioner,supra,52 T.C. at 951; RoanokeVending Exchange, Inc. v. Commissioner,40 T.C. 735, 741 (1963); Krim-Ko Corporation v. Commissioner,16 T.C. 31, 37 (1951). *143 Indeed, it has been stated in the Roanoke Vending Exchange case that the taxpayer's burden is to show that the Commissioner's action in disallowing additions to the reserve was "arbitrary, and amounted to an abuse of his discretion". 40 T.C. supra, at 741. Regardless of how the test is formulated, we think it clear on the unsatisfactory record before us that petitioners have failed to carry their burden of proof. In support of its position that the Commissioner's determination was reasonable and in no event arbitrary, the Government relies primarily upon the so-called "six-year moving average" or the Black Motor Co. bad-debt formula that was approved by the Supreme Court in Thor Power Tool Co. v. Commissioner,supra. That concept is based upon Black Motor Co. v. Commissioner,41 B.T.A. 300 (1940), affd. on other issues, 125 F. 2d 977 (6th Cir. 1942), in which the reasonableness of an addition to the bad debt reserve was measured by a taxpayer's actual bad debt experience during the current year and the five immediately preceding years. Pursuant to the formula, a computation is made to determine the average percentage *144 of debts actually charged off during each of the six years in relation to the relevant outstanding year-end receivables [4] in order to determine what percentage of the outstanding year-end debts of the current year can reasonably be expected to become worthless thereafter. In applying the Black Motor Co. formula to the present case, we fail to find on this record that any debts were in fact charged off as worthless during the current taxable year (1976) or any of the five preceding years. [5] Accordingly, the numerator of the fraction for each of the six years used to compute the average percentage of outstanding debts that can reasonably be expected to become worthless is zero, with the result that Knight was not entitled to make any addition to its reserve under the Black Motor Co. rule. Thus, in the absence of any evidence as to particular circumstances calling for a different result, the Commissioner's action in refusing to allow any addition to the bad debt reserve *145 for 1976 can hardly be characterized as unreasonable and in no sense as arbitrary or as an abuse of discretion. *146 Of course, as recognized by the Supreme Court in Thor Power Tool Co., use of the Black Motor Co. formula may not always be appropriate. Exceptional circumstances may be shown to make it improper in a specific case. For example, a taxpayer's business may be such that resort to the six-year moving average would make a forecast of future losses highly unreliable. Or, if the taxpayer's most recent bad debt experience is unrepresentative for any reason, or if any conditions exist that persuasively indicate the unreliability of past experience as a guide in forecasting future losses, the Black Motor Co. concept will not be employed. See Thor Power Tool Co. v. Commissioner,supra,439 U.S. at 549; Rev. Rul. 76-362, 1976-2 C.B. 45, 46. However, the burden was on the petitioners and they have produced no evidence whatever to establish that there was anything exceptional about Knight's business, or that there were any facts whatever that would justify regarding the year 1976 as different from any of the preceding years. At most, the evidence dealt only with certain outstanding debts as of the end of 1976 that were characterized as "doubtful", *147 but there was nothing in that evidence tending to show that they differed in any way from the outstanding debts as of the end of any preceding year. Moreover, wholly apart from the Black Motor Co. rule, we can find nothing in the evidence to show error in the Commissioner's denial of the $12,797 bad debt deduction based upon Knight's addition to its reserve for 1976. Its total year-end outstanding receivables amounted to $48,407, and its bad debt reserve as of the end of 1975, according to our computation, was or should have been $28,133.92. And even according to the incorrect schedule in Knight's return (which erroneously treated the reserve as commencing in 1974) it was $18,939. Regardless of which figure is used, the reserve should have been more than adequate to absorb any debts which might thereafter become worthless. The evidence in respect of specific debts was woefully weak in petitioners' attempt to prove otherwise.
We set forth the proper standard for reviewing the Commissioner's determination many years ago in Krim-KoCorporation v. Commissioner,supra,16 T.C. at 37: [T]he crux of the matter is not whether the additions to the reserve *148 are sufficient to absorb the bad debts that might arise during the years involved. Rather, the question is whether the reserve itself was sufficient for that purpose. And if the Commissioner was justified in concluding, in the light of prevailing conditions, that the reserve already on the taxpayer's books was adequate, we cannot overturn his exercise of discretion to disallow further additions to the reserve. [6]
At the trial, petitioner George Willard, Knight's treasurer, testified as to four accounts in particular aggregating $11,580.85 [7] as well as several others which he regarded as "doubtful". The largest of these, D & B Homebuilders, was $8,891.50, [8] which arose in 1975 and 1976. However, Knight's annual financial statements in evidence show that D & B Homebuilders had been doing business with Knight for a number of years, and had been paying its bills, at least in substantial part. Thus, the 1973 statement discloses that of total charges of $5,110.60, only $36 remained unpaid as of year *149 end. The 1974 statement shows that $2,803 in new charges were incurred by D & B Homebuilders during that year and that it had paid $1,152.60 of its debts by year end. The 1975 statement reveals that D & B Homebuilders had incurred additional charges of $7,733 and had paid $8,439.20 on its total obligations, leaving only $980.20 outstanding at year end. We were given no convicing reason why the new outstanding charges of $8,891.50 as of the end of 1976 would not be paid. And indeed, the 1977 statement shows that Knight received $6,528 from D & B Homebuilders during that year. The evidence in respect of D & B Homebuilders hardly warrants the conclusion that the outstanding charges of $8,891.50 as of the end of 1976 were likely to be uncollectible. *150 While it is true that more reasonable doubt may have existed as to the collectibility of some of the other debts, there certainly was not sufficient credible evidence to support a conclusion that the bad debt reserve already outstanding ($18,939 according to petitioners and $28,133.92 according to our calculations) was insufficient to absorb all of the debts which could fairly be characterized as doubtful. [9] Cf. James A. Messer Co. v. Commissioner,57 T.C. 848, 864-866 (1972). We therefore conclude, wholly apart from the Black Motor Co. formula, not only that petitioners have failed to show that the claimed addition to the reserve in 1976 was reasonable, but they have totally failed to establish that the Commissioner's action in rejecting that addition was unreasonable and certainly in any event that it was arbitrary or amounted to an abuse of discretion.
*151 2. Additions to tax. There remains for decision whether petitioners are liable for additions to tax pursuant to section 6651(a) for 1976 and section 6653(a) for 1977. Section 6651(a)(1) provides for an addition to tax when a taxpayer fails to "file any return * * * unless it is shown that such failure is due to reasonable cause and not due to willful neglect". Section 6651(a)(1), I.R.C. 1954. The amount to be added is stated to be 5 percent of the amount of tax "if the failure is for not more than 1 month, with an additional 5 percent for each additional month * * * during which such failure continues, not exceeding 25 percent in the aggregate". In this case it is stipulated that each petitioner-couple was at least nine months late in filing its 1976 tax return. Because neither petitioner-couple has shown that such failure to file a timely 1976 tax return was "due to reasonable cause and not due to willful neglect", the 1976 additions to tax must be sustained. Neubecker v. Commissioner,65 T.C. 577, 586 (1975). Section 6653(a) provides for a 5 percent addition to tax in respect of an underpayment where such underpayment is "due to negligence or intentional *152 disregard of rules and regulations". Section 6653(a), I.R.C. 1954. Here too, the burden of proof is upon the taxpayer. Bixby v. Commissioner,58 T.C. 757, 791, 792 (1972). The petitioners have made no attempt to show that their underpayments were not "due to negligence or intentional disregard of rules and regulations". Accordingly, the 1977 additions to tax must be sustained. As a result of concessions in respect of other issues, Decisions will be entered under Rule 155.
Footnotes
1. Knight's return for 1976 erroneously shows a reserve of $18,939 as of the end of 1975, but that figure fails to take into account any additions to the reserve prior to 1974. ↩
2. Schedule F of the 1976 return shows an addition of $12,397, but the deduction claimed was stated to be $12,797.↩
3. Subsection (a) provides for a deduction in respect of debts which became worthless or partially worthless within the taxable year.↩
4. Whatever differences may otherwise exist between the words "receivables" and "debts", they are used interchangeably in this opinion to refer to all money obligations included in Knight's assets.↩
5. The record in this respect is not satisfactory. The returns for all of the years, as well as Knight's annual financial statements, appear to have been prepared by the same accountant that represented petitioners in this proceeding. Knight's first return (for 1970) shows the establishment of a bad debt reserve, and its second return (for 1971) has a schedule for an addition to that reserve which does not reflect any charges against the reserve for debts that actually became worthless. The schedules for the bad debt reserve in the 1972 and 1973 returns are left blank, and show no charges for bad debts that became worthless in either of those years. However, a bad debt deduction was taken on each such return, and we can conclude only that such deductions represented Knight's additions to the bad debt reserve, since it would have been improper to switch from deductions based on a bad debt reserve to specific bad debts without the Commissioner's permission. See sec. 1.166-1(b)(1), Income Tax Regs.; Athol Manufacturing Co. v. Commissioner,22 B.T.A. 105, 110 (1931), affd. 54 F. 2d 230, 231 (1st Cir. 1931); Kay Manufacturing Co. v. Commissioner,18 B.T.A. 753 (1930), affd. 53 F. 2d 1083↩ (2d Cir. 1931). The burden, of course, is upon petitioners, and they have brought forward no evidence to show that the 1972 and 1973 bad debt deductions were other than additions to the reserve or to show that any debts in fact became worthless in 1972 or 1973 and were charged against the reserves. Our findings as to additions to the reserve for 1972 and 1973 are based upon the deductions taken, and our findings as to the outstanding debts for these years are based upon the balance sheets which are part of the returns in evidence. Beginning with the 1974 return, use of the schedule for bad debt reserveis resumed, and the returns for the years thereafter erroneously treat the 1974 return as though it were the first return in which the bad debt reserve had been established. It has been an exasperating experience for us to deal with such sloppy and confusing materials prepared by petitioners' accountant.
6. This language was quoted with approval in Patterson v. Pizitz,Inc.,353 F.2d 267, 268-269 (5th Cir. 1965), cert. denied 383 U.S. 910↩ (1966).
7. These accounts were as follows: Account
Amount
Year created
D & B Homebuilders
$ 8,891.50
1975 & 1976
David Senechaal
340.25
1975
Vallaincourt Brothers
1,163.60
1976
Robert Thurston
1,185.50
1976
$11,580.85
As to one of these, the Thurston account, Knight's financial statement for 1976 discloses that although there was indeed such an account in 1976, there was no balance due thereon as of year end, thus indicating that the account had been fully paid by December 31, 1976. ↩
8. Although this figure appears in the trial transcript, Knight's financial statement for 1976 shows that the balance due on this account at December 31, 1976, was $8,981.50.↩
9. We note further that in the bad debt reserve schedules in Knight's returns for the years 1977, 1978, and 1979, no amounts whatever were in fact charged against the reserve. Such charges would have been appropriate had any of the debts outstanding as of the end of 1976 become worthless during any of these three succeeding years. Also, even though the testimony of petitioner George M. Willard, Knight's treasurer, indicates, largely in vague or conclusory terms often in response to leading questions, that Knight may have "lost" money in respect of some of the outstanding debts, we could not find that such "losses" in the aggregate ever reached the level of Knight's bad debt reserve outstanding as of the beginning of 1976. Further doubt and confusion as to petitioners' "losses" stems from the fact, appearing in the evidence, that the alleged "losses" or at least a substantial portion thereof were accounted for in later years as "sales returns" or "allowances".↩